## Meek Coal Company v. George D. Whitcomb Company.

(Decided May 25, 1915.)

### Appeal from Johnson Circuit Court.

1. Sales—Of Machinery—Rescission of Contract—Duty of Purchaser.
—The purchaser of machinery under a written contract cannot keep the machinery for an unreasonable length of time after he discovers that it is not doing satisfactory work or fulfilling the conditions of the contract as he understands it, and then seek to recover damages or a cancellation of the contract. The purchaser, when he discovers that the machinery is not doing the quantity or character of work it was agreed it would do, if he wishes to hold the seller liable for a breach of the contract, or have a cancellation, must, within a reasonable time after the discovery is made, tender or offer to tender the machinery back and rescind the contract.

2. Sales—Of Machinery—Rights of Purchaser to Cancel Contract—Reasonable Time—Reliance on Promises of Seller to Repair.—What is a reasonable time in which a purchaser must offer to tender back machinery that does not give satisfaction, depends on the facts of each case, and the time may be extended by his reliance on efforts of the seller to remedy defects in the machinery and promises that he will do so.

C. B. WHEELER for appellant.

JOHN W. WOODS and B. O. BECKER for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

On April 27, 1907, the appellee, Whitcomb Company, submitted to the appellant coal company a proposition to furnish it a Norwalk Compound Air Compressor for the sum of $2,900, and certain other appliances to be used in connection with the compressor for $857.50, making the total cost of the machinery $3,757.50. The proposition also contained a stipulation that the Whitcomb Company, if the offer was accepted, would send an experienced man to take charge of setting the compressor and making connections thereto free of charge for a term not to exceed ten days; and another stipulation that the Whitcomb Company "will guarantee the material and workmanship in the above machinery to be first class in every respect and will replace free of charge f. o. b. cars, the factory, any and all parts that may fail from any defect in the material or workmanship within one year from day of sale." The proposition

also contained several clauses relative to the execution of deferred notes and the time of their payment, and also provided that the proposition was not subject "to. any verbal changes or agreements, and any changes in the above contract to be binding must be made in writing and must receive the approval of an executive officer of the George D. Whitcomb Company before becoming a part of this contract."

This proposition was accepted by the coal company, on May 2, 1907, and thereafter, on July 1, 1907, a contract was entered into between the parties. This contract was in the form of a lease of the machinery by the Whitcomb Company to the coal company, and contained a number of stipulations. Among them was one that the contract price of the machinery, which included some items of interest, was $3,925.10.

On July 9, 1908, the parties entered into another agreement setting out that the coal company had purchased from the Whitcomb Company additional machinery of the value of $864.61 and had executed to the Whitcomb Company six notes of equal amounts for this sum, payable at specified times.

In July, 1909, the coal company brought this suit on the common law side of the docket against the Whitcomb Company, in which it averred, in substance, that it purchased the compressor for the purpose of using it in the operation of a coal mine owned by it. That the Whitcomb Company guaranteed that the compressor had capacity to operate fifteen machines, but that when it was put to use, it was discovered that it would not operate more than three. It further averred that upon making this discovery it at once notified the Whitcomb Company, and it agreed to remedy the defect, whatever it might be, in the compressor, so that it would do the amount of work guaranteed; or, in other words, operate fifteen machines, but failed, or at least did not do so. It further averred that it had expended $2,750 in installing this machinery, and it sought judgment against the Whitcomb Company for this sum, together with $1,761 that it had paid in monthly installments on the contract price, and for an additional sum of fifty-thousand dollars, damages that it had sustained by the failure of the compressor to do the amount of work it was guaranteed it would do. It also asked a cancellation of all unpaid notes executed by it.

In an amended petition it averred that upon discovering the failure of the compressor to do the work guaranteed, it offered to return the machinery and renewed this offer a number of times, and the only reason it retained the machinery was because the Whitcomb Company refused to accept it and insisted that it should keep the machinery and permit the Whitcomb Company to remedy the defects and make it conform to its guarantee.

In another amended petition it set up specifically the damages it sustained on account of loss of profits on coal contracts incurred by reason of the failure of this machinery to do the work it was guaranteed to do.

In another amendment it averred that in purchasing the compressor it relied on certain representations made by the Whitcomb Company and its agents as to the capacity of the compressor.

For answer to the petition as amended, the Whitcomb Company, after denying certain averments in the petition, affirmatively set up that the only contract it had with the coal company was a written contract, and the only guarantee that it made was contained in that contract, and that it had fulfilled all of the conditions and guarantees of the contract. It further set up the unpaid notes executed by the coal company in part payment of the compressor and machinery purchased by it and asked judgment on these various notes.

After the case had been prepared for trial by the taking of a number of depositions for both parties, it was submitted and a judgment entered dismissing the petition of the coal company and giving to the Whitcomb Company a judgment for so much of its debt as remained unpaid.

The first complaint urged by counsel for appellant is the refusal of the trial court to submit certain issues to a jury. The record shows that on June 7, 1910, and after the answer and counterclaim had been filed, the following order was made: "This cause by agreement of the parties and their attorneys made in open court is transferred to equity and is ordered placed on the equity docket, but the right of the plaintiff to submit the question of the amount of damages, if any be allowed by the chancellor, to a jury is reserved. All other questions herein are to be tried by the chancellor upon evidence taken in the form of depositions."

In November, 1910, counsel for the coal company moved the court to transfer the action to the ordinary docket for trial before a jury. In support of this motion some affidavits were filed showing that there was a misunderstanding about the order transferring the case to equity and that in fact this order was not agreed to. On the other hand, counter-affidavits and exhibits were filed showing that it was agreed to, and the court, after considering the motion and affidavits for and against it, overruled the motion to transfer the case to the ordinary docket for trial by a jury. It further appears that on November 28, 1912, the court ordered the submission to the jury of the issue as to whether there was a breach of warranty in the sale of the machinery, and if so the damage the coal company had sustained by reason thereof, and that on March 3, 1913, counsel for the Whitcomb Company moved the court to set aside this order made in November and in support of and against this motion certain affidavits were filed.

The court upon considering this motion, sustained it, and then proceeded to hear and determine the case under the agreed order made in June, 1910.

We have examined quite carefully the record relating to the agreed order in June, 1910, and do not find any reason that would warrant us in saying that this order was not agreed to. It appears from this order that if the court, after considering the evidence, concluded that the plaintiff was entitled to any damages, it reserved the right to submit the question of damages to a jury. In other respects the order appears to have been a final one. In view of the fact that this order transferring the case to equity to be disposed of by the chancellor was agreed to by the parties and their attorneys, it cannot well be said that the court abused its discretion in refusing, after reading the record and determining that the coal company was not entitled to any damages, to submit any issues to a jury. If the court had reached the conclusion that the coal company was entitled to any damages, we take it that this issue would have been submitted to a jury. The action was brought in ordinary, and was such an action as entitled either of the parties to a trial of the issues before a jury, but the parties undoubtedly had the right to agree that the case should be transferred to equity and tried by the chancellor, and this it appears they did.

It is further complained that the court, after making the order in November, 1912, submitting certain issues to a jury, committed error in setting aside this order. It appears that this order was made by the court, and that afterwards the court, on motion of the Whitcomb Company, set aside this order and disposed of the case under the order made in June, 1910. It should also be noticed that in June, 1911, this agreed order was entered:

"It is further ordered by agreement of the parties and their attorneys that this cause be and it is hereby submitted for judgment upon the question heretofore ordered to be tried by the court, and the parties have the right to take any further evidence they may wish to take which they would have the legal right to take before submission for judgment until the tenth day of August, 1911."

This agreed order confirms the agreed order made in June, 1910, and shows that it was intended by the parties that the case should be tried by the court except as to the question of damages. But if the court found that the coal company was entitled to any damages this issue should go to a jury.

Accepting the view of the matter that the parties agreed that the court might hear and determine the case without a jury unless the court came to the conclusion that the coal company was entitled to damages, we will now look into the evidence a little more carefully for the purpose of determining whether the coal company was entitled to any damages. If it was not, the judgment of the lower court dismissing the petition of the coal company and giving the Whitcomb Company judgment for the balance of its debt, should be affirmed.

It appears that this machinery had been used by a coal company at Oakdale, Ill., for some five months before it was sold to the appellant coal company. It was shipped directly from the Illinois mine to the Kentucky mine, and the uncontradicted evidence of the Illinois mine owners and operators shows that the machinery gave entire satisfaction during the time that it was operated at this Illinois mine. It further shows, however, that at this Illinois mine the machine was operated and attended to by skillful and competent men, and that a sufficient supply of air was always provided. It is further shown that during the most of the time the com-

pressor was used by the Illinois people it ran eight machines and for a part of the time ten.

When this machinery was installed at the coal mine of the appellant, some expert mechanics furnished by the Whitcomb Company superintended the installation and remained several days until the compressor was found to be operating in a satisfactory manner. It appears, however, from the evidence of the witnesses for the coal company that the compressor would only run in a satisfactory way three machines, and that it was continually breaking down and getting out of fix in one way or another. Also that it made a number of complaints to the Whitcomb Company about the unsatisfactory work the compressor was doing, and the Whitcomb Company on several occasions sent mechanics to investigate the matter and remedy the defects.

The evidence of the witnesses for the Whitcomb Company is to the effect that the compressor did good work while they were attending to it, but at no time was it attempted to operate more than four machines, and it was also shown by their evidence, as well as the evidence of others, that the men who were operating this machinery for the coal company were inexperienced and incompetent, and that the machine under their supervision did not do good work; first, because they did not know how to operate it; second, because the supply of steam was not sufficient.

It also appears that in August, 1910, the coal company sold this machinery to another company, and the manager of this company testifies that when he received the compressor it was in a run-down and bad condition generally and would not do satisfactory work. That after making a number of efforts and spending a good deal of money in trying to remedy the defects, it was discovered that the trouble was in a cylinder, and when this cylinder trouble was discovered and remedied, the machine gave satisfaction. In fact it appears from the evidence of this witness that the only defect in this machinery was in the cylinder and that this defect existed from the time the cylinder was made. In view, however, of the satisfactory work this machinery, including the cylinder, did for the Illinois coal company, it is apparent that the defect in the cylinder was not caused by faulty construction, but by something that happened after it left the Illinois mine.

Without extending this opinion on this point, we may say that it appears the unsatisfactory work of this compressor, except as to the number of machines it would run, was due to the fact that the men who were operating it did not understand their business. The most perfect machinery, if it is complicated, must be looked after and operated by skilled and experienced persons, and if not, it is liable to get out of fix and out of repair and not do the work it is capable of or the quality or quantity of work that it would do if in the hands of competent, skillful men. In respect to the failure of the compressor to operate fifteen machines, it may be here said that there was no contract guarantee that it would do this, and agents of the company were not authorized to bind the company by representations outside of the written contract.

There are some other facts and circumstances shown in the record that weaken very much the case for the coal company. This machinery, as stated, was bought by the coal company in April, 1907, and installed by it probably in June, 1907. The contract stipulated that monthly payments beginning in August, 1907, were to be paid on the purchase price until it was satisfied, and the evidence shows that the coal company paid on these monthly installments $176.13 each month until it had paid $1,761.30. It further appears that in July, 1908, the coal company purchased from the Whitcomb Company additional machinery, to be worked in connection with the compressor, of the value of $864, and that it executed six notes of equal amounts for this sum, due in monthly installments. Now if the machinery failed to fulfill the guarantee or was in such defective or unfit condition as the coal company claimed, and did not do satisfactory work at any time, it is singular that the coal company should have paid these monthly installments and have again in 1908 entered into another contract for the purchase of other machinery to be used in connection with this compressor.

The coal company undertakes to explain this by saying that the Whitcomb people were continually sending men to repair and fix the machinery and continually insisting that the coal company keep it and that everything would be worked out in a satisfactory way. This excuse, however, is not sufficient to explain the conduct of the coal company in keeping the machinery for the long time it did and in making at different

times the number of payments that it made, especially in view of the fact that the compressor did not at any time run in a satisfactory way more than three machines.

We had a case a good deal like this in Dick v. James Clark, Jr., Electric Co., 161 Ky., 622. In that case Dick bought from the electric company a vacuum cleaner in 1910. In 1912 the company brought suit to recover the purchase price. For defense to this suit Dick set up that he purchased the cleaner under a guarantee that it would give him entire satisfaction, but that it had never done satisfactory work and that the electric company, on numerous occasions, had promised to repair it, and that relying upon these promises and also on its efforts to repair, as well as its insistence that he keep the cleaner, he retained possession of it until March, 1912. In other words, relying on the assurances of the electric company that it would put the cleaner in satisfactory condition, and upon its efforts, through its employes, to do this, he was induced to keep it. The lower court, on a trial of the case before a jury, instructed the jury to return a verdict for the electric company, and on appeal, this ruling was affirmed. In the opinion the court said:

"When a purchaser, under a contract like this, receives property or machinery of any kind, he is allowed a reasonable time in which to determine whether it is satisfactory to him or not; but, if he finds it is not satisfactory, he must return it within a reasonable time after coming to this conclusion." It was also said in that case: "If the company had requested Dick to keep the cleaner until it could be made to do satisfactory work, or if, by its course of dealing, it had induced him to believe that he could keep the cleaner without losing his right to return it within a reasonable time, it could not meet his defense by the assertion that he had lost his right to avoid the purchase price by his failure to return the cleaner within a reasonable time. But we do not think the facts bring the case within the application of this rule; and, as the election was with him to either keep or return the cleaner, we think that by failing to return it within a reasonable time he lost his right to do so, and must pay the purchase price."

In the case we have Mr. Meek, the president and general manager of the coal company, testified that the compressor did very good work operating three machines, but would run four only with a good deal of

effort, and it was found that it would not operate five at all. That this condition was discovered within two months after the compressor had been installed. That when it was found the compressor would not operate five machines, W. W. Hall, a representative of the Whitcomb Company, made an examination of the machinery but did not succeed in making it do any better work, and after that a man named Jones was sent by the Whitcomb Company and he did not succeed in making it do good work. That after this other men came with like results. He further says that during the year 1908 he "tried to get the George D. Whitcomb Co., through Mr. Hall, to take the compressor back, but they refused to do it. I also tendered the compressor back after the filing of this suit and they refused to take her."

It further appears that the coal company continued to use and operate this machinery from the time it was purchased until August, 1910, when it sold it to the Yellow Chief Coal Co.

In answer to the question: "You say you tendered back the compressor to the George D. Whitcomb Co. in the year 1908; please state how you did that?" Mr. Meek replied: "I simply asked Mr. Hall, in the presence of other parties, to take the compressor out, that I could not do anything with it. Q. Is that the only way that you made the tender back to the Whitcomb Company? A. At that time it was. Q. Was that the only way you made a tender back to the company of this compressor or machine until after the suit was brought? A. I believe that it is. Q. You continued to use this compressor or machine right along until this time? A. We did because that was the only thing left for us to do."

It also appears from the evidence of Mr. Meek that in October, 1908, the Whitcomb Company wrote him a letter in answer to a letter complaining about the manner in which the compressor was working, and in this letter the Whitcomb Company, after setting out that the bad work of the compressor was due to lack of attention and skill, and that it was not responsible for that condition, also advised that "our guarantees do not cover the maintenance or care of the machinery at your mine, and we are not responsible in any way for the performance of a compressor after it has been used for a year or more." In November, 1908, the Whitcomb Company also wrote another letter in which it said:

"We do not hold ourselves accountable for the condition of your compressor at the present time, nor are we responsible according to our contract after putting same in condition. Nevertheless we have had our men at your mine at considerable expense trying to locate where the trouble is and put the compressor in good shape. This compressor was delivered to you in good working order according to our contract, and before it was shipped to you it was operating ten machines, therefore, the condition it is now in is due to lack of care and to wear during the year you have operated it, and we are not responsible for this condition." Again, in December, 1908, the Whitcomb Company wrote another letter to the coal company along the same line.

We think it fairly appears from this evidence that the coal company did not tender or offer to tender this machine back until it brought this suit in July, 1909, or until after it had used the machinery for about two years, in the meanwhile making the monthly payments it agreed to make. Under these circumstances we think the coal company lost its right to have a rescission of its contract.

In cases like this the purchaser of machinery under a written contract in which the rights of the contracting parties are set forth, cannot keep the machinery for an unreasonable length of time after he discovers that it is not doing satisfactory work or fulfilling the conditions of the contract as he understands it, and then seek to recover damages for loss he may have suffered on account of the failure of the machinery to work in a satisfactory manner or a cancellation of the contract. The purchaser, when he finds out that the machinery is not doing the quantity or character of work it was agreed according to his understanding it would do, if. he wishes to hold the seller liable for a breach of the contract, or have a cancellation, should, within a reasonable time after the discovery is made, tender, or offer to tender, the machinery back and rescind the contract. If he keeps the machinery for an unreasonable length of time without doing this, he will be deemed to have waived his rights under the contract and must perform its conditions. In one form or another we have, in a number of cases, announced this rule: Vogle v. Moore, 27 Ky. L. R., 94; J. I. Case Threshing Machine Co. v. Patterson, 137 Ky., 180; J. I. Case Threshing Machine Co. v. Mattingly, 142 Ky., 581.

Of course what is a reasonable time within which the purchaser must act depends on the facts and circumstances of each case. It might also be extended by the promises and agreements of the seller to repair the machinery, and by its insistence that the purchaser keep it and give the seller an opportunity to make it do the agreed work.

In this case, setting aside for a moment the efforts of the seller to satisfy the purchaser that the machine would do good work, it is manifest that the coal company did not tender or offer to tender back the machinery within a reasonable time after it discovered that it would not fulfill the contract. It knew, according to the evidence of the officers of the coal company, in the fall of 1907, and within a few months after it commenced to operate this machine, that it would not do satisfactory work or the character or quantity of work it was represented it would do. But, in place of tendering the machine back and insisting on a cancellation of the contract, it continued to operate it for nearly two years, in the meantime making a number of payments on the purchase price. By this course of conduct we think it plain, under all the authorities, that the coal company waived its right to demand a cancellation of the contract, and consequently its right to sue for damages for a breach of the contract.

But the argument for the coal company is made that although it did keep this machinery for an unreasonable length of time before tendering or offering to tender it back, it was induced to do so by the efforts of the Whitcomb Company to put it in good condition and by its promises to do so, coupled with the insistence that the coal company keep the machinery until it could be made to work in a satisfactory manner.

We have carefully read and considered the evidence relating to this feature of the case, and our conclusion, as before stated, is that the evidence for the coal company is not sufficient to bring it within the rule that the conduct of the Whitcomb Company excused its failure to tender the machinery within a reasonable time.

The principal contention of the coal company is that the compressor would not operate the number of machines guaranteed by the agent; or, in other words, fifteen; but it knew all the time that the compressor would not operate this number of machines, or indeed any number exceeding three or four. It further knew

that when the mechanics of the Whitcomb Company came to adjust and did adjust the machinery and remedy such defects as were discovered, they could not and did not attempt to make it operate anything like fifteen machines. So that, according to the views of the coal company, the machine did not at any time or under any circumstances fulfill what it considered one of the principal guarantees in the contract. The coal company was not misled or deceived after it started the compressor as to the number of machines it would work, and could not have been misled or deceived upon this point by the course of dealing or the conduct of the Whitcomb Company. It could not have been induced to keep the compressor under the impression that it would operate fifteen machines.

As we view the case, the coal company was not entitled to recover any damages for breach of the contract, and therefore the court did not err in giving judgment for the amount due the Whitcomb Company.

Wherefore, the judgment is affirmed.