## Oman-Bowling Green Stone Company v. Sullivan Machinery Company.

(Decided June 1, 1915.)

## Appeal from Warren Circuit Court.

Sales—Counter-Claims for Breach of Warranty—Weight and Sufficiency of Evidence.—The long continued and constant use of a machine, accompanied by a continuance of the payments on the purchase price, extending over a period of two years, are circumstances of such character that although complaints were made

concerning the machine, the burden was imposed on the pur-
chaser of proving an alleged breach of warranty by clear and ex-
plicit testimony.

W. B. GAINES for appellant.

SIMS & RODES for appellee.

OPINION OF THE COURT BY JUDGE HANNAH—Affirming.

In September, 1910, the Sullivan Machinery Com-
pany, a manufacturer, sold to the Oman-Bowling Green
Stone Company, operators of a stone quarry in Warren
County, a certain steam channeller for use in the lat-
ter's quarry near Bowling Green. The machine was
shipped and delivered to the purchaser in March, 1911,
and put into operation soon after its delivery.

In September, 1912, the purchaser still owed the
machinery company nine hundred dollars on the pur-
chase price of the machine, the same being secured by
chattel mortgage thereon; and the machinery company
brought this suit in equity to recover that sum and to
enforce its lien on the machine. Upon submission and
trial, the chancellor found for the plaintiff and rendered
a judgment accordingly, from which the defendant ap-
peals.

The record discloses that the purchase price of the
machine was $2,900, of which $500 was paid on the de-
livery of the property, and the remainder, $2,400, was
evidenced by eight notes of $300.00 each. All but three
of these notes had been paid by September, 1912, when
this action was instituted.

The defendant sought to avail itself of an alleged
breach of warranty by way of recoupment. The record
contains a large number of letters exchanged by the
parties, showing that complaint was continually made
by the purchaser concerning the working of the machine;
but in the light of the evidence upon the subject of the
performance of the machine, we are inclined to the view
to which expression was given by the chancellor in his
opinion, i. e., that these complaints were made for the
purpose of justifying their frequent and repeated de-
lays in meeting the payment of the notes, rather than
because of any actual default upon the part of the ma-
chine.

The machine was placed in operation in March,
1911, and operated until December 17, 1911, the close of the

quarry season. It was again operated during the quarry season of 1912. During the period of use, although appellants kept complaining concerning the performance of the machine, they kept on paying and renewing the notes they had executed for it until they had paid $2,000 of the $2,900 purchase price. It may be conceded that there were some immaterial imperfections of the machine; but, as the chancellor suggests, it would seem that if the faults were so serious as appellants are now contending, that the natural thing for them to have done would have been to refuse to make further payments until the defects were remedied.

The principal complaint seems to have been in respect of the "steels"—the attachment used in connection with the machine by which the actual cutting of the rock was accomplished. The record discloses that the machinery company from time to time sent new steels for the machine, and that although repeated requests were made by appellee for the return of the alleged defective steels, so that an examination could be made of them for the purpose of ascertaining the cause of the troubles complained of, no such return was ever made by appellants. The record shows that on January 20, 1912, complaint was made concerning steels which the machinery company had forwarded in August, 1911, to be used in lieu of those originally furnished; and that on February 6, 1912, an agent of the machinery company went in person to the quarry. He testified that he then examined these steels and that they were then all right, and that Mr. George Oman, who was in charge of the quarry, admitted such to be the fact, and in reference to the complaining letters said that there was some mix-up or misunderstanding at the Nashville office of the stone company.

It was from this Nashville office that the financial affairs of the appellants were being conducted, and where the voluminous correspondence originated which had to do with the efforts of appellants to obtain extensions of time on the notes which they had given for the machine. Mr. George Oman testified, but he did not attempt to controvert the statement mentioned. In fact, he himself admitted that the machine, on April 19, 1913, when he gave his deposition, was worth $2,000, and this after it had been used during two quarry seasons.

The appellants introduced only one of the several persons who operated the machine for them, and his evidence on the subject was as follows:

"Q. At the time this machine was installed and they began using it, was there any trouble with it? A. Yes, sir; there was a leak in the top-head, making it very unpleasant for the runner. Q. When was that first noticed? A. It was noticed when they first started the machine. Q. Steam and water came out of the leak into the face of the workman running the machine? A. Yes, sir. Q. Do you remember any other trouble with it? A. Some rivets leaked around the fire door; that was about all I noticed."

And this is the extent of the defects as shown by this witness, who was in the employment of appellants during the quarry seasons of 1911 and 1912.

The only other of the several persons who operated the machine and who testified was introduced by the machinery company; and he said: "No, there was nothing particular the matter with it. The piston key came loose and I fixed it, and it never gave any more trouble after that. It leaked a little around the top-head. It broke one spool valve and they got a new one." He also said they had some trouble with the steels.

The appellants themselves, in a letter to appellee, dated July 15, 1911, said: "We do not want you to think we held up payment on account of the failure of the machine, which we felt was due all the time to the steel; but it was simply because we did not have the money to pay it."

And as late as July 8, 1912, we find appellants telegraphing to appellee inquiring whether appellee would release its mortgage on the machine upon the payment of the $900 and interest, the amount of the unpaid notes for which judgment was herein recovered.

The long-continued and constant use of the machine, accompanied by a continuance of the deferred payments on the purchase price thereof, extending over a period of two years, are circumstances of such character that although complaints were made, there was imposed on appellants the burden of proving the alleged breach of warranty by clear and explicit testimony. It seems to us that the persons who operated the machine were the best witnesses by whom its alleged failure of performance might have been shown, but apparently, as the

chancellor says in his opinion, no efforts were made by appellants to produce them. It may be conceded that there were some immaterial and easily remedied defects in the machine, but the weight of the evidence shows no such substantial shortcoming in respect thereof as will justify or uphold the claim of appellants to recoupment in this action to recover the remainder of the purchase price. Meek Coal Co. v. Whitcomb, 164 Ky., 833.

The judgment is affirmed.