### Paducah Hosiery Mills v. Proctor & Schwartz.

(Decided October 27, 1925.)

#### Appeal from McCracken Circuit Court.

1.  Evidence—Testimony of what Witness Said About Machines Held Improperly Excluded, where he was Plaintiff's Agent.—In seller's action for price of hosiery machines, testimony that seller's agent sent to correct troubles in machines had stated that he could not make machines do the work and that they were designed for silk hose and were not designed for cotton hose, and could not be made to do good work on cotton hose, was improperly excluded, though plaintiff had the right to show that agent was not a skilled mechanic, and not qualified to speak on the subject; proof only going to weight of evidence, and not to its admissibility.

2.  Sales—Right to Rescind for Breach of Warranty Must be Exercised in Reasonable Time After Learning of Defects in Machinery. —If machinery is sold under a warranty, and does not come up thereto, vendee may, if he acts promptly, rescind the contract, but right must be exercised in a reasonable time after learning of defects in the machinery.

3.  Sales—Buyer of Machines Held to have Lost Right to Rescind for Breach of Warranty.—Buyer held to have lost right to rescind

contract for sale of hosiery machines for breach of warranty, where, though it continued to make complaints thereof, it continued to use the machines, and refused to allow vendor's experts to inspect them, and retained exclusive possession of them until it supplied itself with other machinery to substitute for them.

4. Sales—Purchaser, to Recover on Warranty, Not Obliged to Offer to Return Thing Sold.—If there is a breach of warranty, purchaser, to recover thereon, is not obliged to offer to return thing sold, since he may retain it and sue for damages on the warranty.

5. Sales—Implied Warranty, where Vendor Sells Machines Knowing Purpose for which They are Intended.—Ordinarily, where vendor sells machines, well knowing specific purpose for which they were intended, there is an implied warranty that machines are reasonably adapted to that purpose.

6. Sales—No Implied Warranty, where Quantity of Work Machine would do was Expressly Guaranteed in Writing.—Where quantity of work that hosiery machines sold buyer would do was expressly guaranteed, there was no implied warranty that they would do more, and vendor could not maintain that they satisfied the contract if they did less.

7. Contracts—Contract Put in Writing Supersedes all Previous Oral Negotiations.—Where parties put their contract in writing, it supersedes all previous oral negotiations.

8. Evidence—Evidence of Oral Representations that Machines would Produce More than Specified in Written Contract should have been Excluded.—In seller's action for price of hosiery machines, where quantity of work that machines would do was expressly guaranteed in writing, evidence of oral representations to effect that machines would produce more than specified in written contract was inadmissible.

9. Sales—Written Contract, Fixing Standard to Determine whether Machines Sold were Reasonably Adapted to Purpose Intended, Conclusive.—Where, by written contract for sale of hosiery machines, parties fixed standard by which it could be determined whether machines were reasonably adapted to purpose intended, neither of parties can maintain that machines were not reasonably suited for purpose intended, if they produced as specified in the written contract.

10. Sales—Written Contract Held to Imply Machines Sold were to be Used in Manufacturing Cotton Hose.—Written contract for sale of hosiery machines held to necessarily imply that they were to be used in manufacturing cotton hose, where it was well known by both parties that this was the purpose for which the machines were purchased.

11. Sales—Buyer Held Not Entitled to Recover for Loss of Profits from Breach of Warranty in Sale of Hosiery Machines.—In seller's action for price of hosiery machines, buyer held not entitled to recover on counterclaim for breach of warranty, for loss of profits

due to breach, where it was not within contemplation of either of parties at time of transaction.

12. Sales—Measure of Damages for Breach of Warranty of Machinery Stated.—Measure of damages for breach of warranty, in sale of machinery, is difference between fair value of machines as they were and as they would have been if they had come up to warranty.

13. Sales—Buyer Entitled to Recover Difference in Value of Machines as They were After Delivery, and Their Value if They had been as Warranted.—In seller's action for price of hosiery machines, buyer held entitled to recover on counterclaim for breach of warranty, difference if any in value of the machines as they were with parts added to them after their delivery, and their value if they had been as warranted.

BRADSHAW & MacDONALD for appellant.

J. D. MOCQUOT and MOCQUOT, BERRY & REED for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Reversing.

The Paducah Hosiery Mills is a corporation located at Paducah, Kentucky, which manufactures cotton hose. Proctor & Schwartz is a Pennsylvania corporation located at Philadelphia, which manufactures machinery. In December, 1921, it sold and delivered to the Paducah Hosiery Mills four Proctor automatic boarding, drying and stripping machines for the sum of $12,000.00, of which $500.00 was paid, the remainder to be paid in monthly installments of $500.00 each. The machines were delivered and the purchaser paid ten of the monthly installments and then declined to make further payments. The seller brought this action to recover the balance of the price. The defendant filed an answer and counterclaim in which it set up the written warranty under which the machines were sold, alleging that the machines were not as warranted and were of no value; that the seller knew the purpose for which they were intended and sold them for use for this purpose; that the machinery was entirely unsuited for the manufacture of cotton hose and that the production of its factory had been cut down by reason of the defective machinery, to its damage in the sum of $38,000.00. The case came on for trial before a jury and at the conclusion of the evidence for the plaintiff and the defendant, the court peremptorily instructed the jury to find for the plaintiff. The defendant appeals.

The written contract contains the following provisions:

"*Capacity.* The machine is guaranteed to at least double the production of an operator over the quantity turned out by the same operator when boarding by the method of using wooden boards, drying the hosiery in dry boxes and stripping by hand, in short, each dryer is guaranteed to save at least one operator. The above production is based on live steam of not less than eighty pounds pressure being carried on the heater coils.

"*Machinery.* The working parts are made of suitable materials, selected after a demonstration as to the kind of material best suited to the work to be performed. High carbon steel is used where the strains are greatest. Bronze and gray iron castings are used where such materials give the best wear. Bushed bearings are used where practicable, in order that repairs may be made by simply replacing a bushing instead of an entire casting.

"*Liability Clause.* In the event the herein described machine does not work in full accordance with these specifications then it is agreed that, after the company has tried to make it work in accordance with the specifications by either adjusting, altering or adding to it as the company deems necessary, if it still fails to perform as herein agreed, the company must remove the machine if ordered to do so within ninety days from the date the dryer was started in operation.

"And it is further agreed that if the company concludes within ninety days from the date the dryer was started in operation that it can not make the machine work in accordance with these specifications, then the company has the right to remove the machine, and that the removal of the machine under either of the above agreements shall discharge all liability of the company under this contract, it being agreed that if the machine is removed the company shall cancel all charges for the machine and refund any payments that may have been made in advance.

"This proposition is made with the understanding that all machinery, materials and supplies herein specified shall be of good and suitable quality, and that all work specified shall be performed in a good

and workmanlike manner and completed in the manner and at the time specified, provided that the company be not delayed by any person or persons, or from any cause not within its control. The receipt of the apparatus by the purchaser shall constitute acceptance for delivery and a waiver of any and all claims for loss or damage due to delay.

"It is also agreed that all communications between the parties hereto, either verbal or written, with reference to the subject matters of this proposal, are hereby abrogated, and this proposal duly accepted and approved, constitutes the agreement between the parties hereto, and no modification of this agreement shall be binding upon the parties hereto, or either of them, unless such modification shall be in writing, duly accepted by the purchaser and approved by an officer of the company."

The proof for the defendant showed these facts:

The machines were delivered in December, 1921. An operator boarding by the method of using wooden boards would do twelve or thirteen dozen hose an hour, or from one hundred and twenty to one hundred and thirty dozen in a day. The machines would drive only on second speed and each would do only about seventy-five dozen a day. Complaint was made to the seller promptly. Its manager, Major Griffith, came to Paducah, bringing a mechanic with him. He was unable to remedy the trouble, and finally said that he would go home and see if he couldn't devise something to do the drying. Thus things went along and another trouble developed. The goods would not pile on the table correctly and they had more or less trouble with the fingers which stripped the hose from the forms. The cams also gave trouble; they would catch and bend and stop the machine. The seller's agent went home and in April the vendor sent down a new dry box, and a Mr. Klenk then came. He put on the new dry box and went all over the machine and fixed up things. After that the drying part was satisfactory on that machine. On May 15th the vendee wrote the vendor this letter:

"This is to advise you that your erector has come and gone. He has straightened up all the machines here, putting on the parts indicated in your letter of the 23rd of March, and also the new dryer with 32″ fan, etc. We want to say that we are well

pleased with this new design and have now had it running a little over a week and it has proved very satisfactory and we feel sure that we can get an average of 23 dozen per hour on size nines, cuff top, without exceeding 240 degrees of temperature, therefore, we ask you as to your letter of March 23rd, if the dyrer proves satisfactory you are prepared to build three more exactly like them and ship them promptly. This we ask you to do at once, as we are sure this will solve our drying problem, and we congratulate you in bringing out this new design.

"Awaiting your further advices."

The vendor promised to send the other three dryers, and some complaint was made that they had not come sooner. On July 17th the vendee wrote that they needed two guide rails and a cam; on August 7th they wrote that "the last dryer is all right as to temperature and drying but there must be something done to the forms to hold the stocking leg down. We notice that they do not pile up right in coming off on the movable board; that is where they stack up, one-half dozen in a stack. This must be corrected as far as possible to make them satisfactory." Soon after this letter the three other dryers arrived and were put in by the vendor's agent, Dennison. About that time the old superintendent of the hosiery mill was promoted to another office and a new superintendent, Mr. Campion, came in. On September 2nd he wrote the vendor that Dennison had completed examining the machines but they were not satisfactory with laying legs of hose; that they wanted him to stay until the clamps arrived and also would like to have new trip collars as promised. On October 24th the old superintendent wrote that after an absence of three weeks the new man was not getting along at all with the dryers and was importuning them to give him the Paramount forms. The letter concludes with these words:

"Since the wings were put in we have no fault to find with the action of the machines either in the drying or the length of the stocking as it comes off, but we are having too much machine troubles and I want to know if it is possible for you to send us a man for your own protection and ours, who is competent to board 200 dozen a day on one of these ma-

chines, providing we furnish a hand to offbear the goods from the table.

"I cannot help but feel that there may be some weak spots in the operation of the machines that are not given the attention they deserve to keep them in constant operating order, and I cannot help but feel that they are a more economical unit in operation than the forms.

"The above is my story, and I want to know what you can do to straighten out the situation and show our Mr. Campion that his conclusion is wrong."

The vendor answered this letter, saying they would send a man, and did send Mr. H. R. Griffith. After he left the vendee wrote this letter on November 13th:

"Your Mr. H. R. Griffith, who left here on last Saturday for Philadelphia, stating that the machines we now have here were not right in any detail and could not and would not do the work that is expected of them under your contract, and he further stated that it was useless for him to remain here any longer trying to get the machines in shape, and he had better go home and take this matter up with you, so you would thoroughly and clearly understand where the trouble and fault lies.

"These machines have not been satisfactory and have not given us the proper work since they were installed, and inasmuch as this statement comes from one of your experts you sent here, we come to the conclusion that we will make no further payment until they are in perfect working order and so constructed that they will give us the proper work and turn out the quantity of merchandise per machine per day that is expected of them, and under these conditions we would advise your Major Griffith to proceed to come to Paducah at once so we can go over this matter more thoroughly, as from the conversation with Mr. Griffith he seems to be satisfied and came to the conclusion that machines are not right and cannot do the work you guaranteed them to do.

"Your representative further stated that it was useless for him to remain here any longer and try to teach any one to board on the machines, as in his

opinion we had just as good boarders and they could turn out just as much as the men in Philadelphia. So we feel that it is clearly up to you to give us machines that will do the work or remove the machines from our premises as quickly as possible, as it is very expensive and annoying to us not to be able to get the production we were guaranteed.''

The testimony for the defendant shows that after the new dryers were put on there was no more trouble with the drying, but that the cams and finger attachments continued to give trouble; that the machines did not operate except on a very slow speed and if operated beyond that they became wracked and could not be operated at all; and while operated on the high speed the production was only about 165 dozen a day, and that it would maintain this rate of production only for a day or two before the machine would be so wracked that it couldn't operate at all. The finger motion that was supposed to pull the hose off the boards was in bad order all the time; and had to be often readjusted; the conveyor gave trouble; it would work with a jerk. The stacking apparatus, instead of stacking, would assemble the goods all over the table and that would cause an extra operator to make them stack properly. The cams often snapped off and they would then have to weld them or wait for new ones. When Griffith came late in October to remedy the trouble in the finger motion and the tables, he, after working on the machines some days, said he could do nothing with them; that these machines were made for silk hose and were not suitable for the manufacture of cotton hose. He stayed about a week and on his return east, after the letter of November 13th was received, the vendor sent Mr. Dennison down to look at the machine. He suggested that the trouble was in the operator, and at his request he took a mechanic named Crawley and trained him for a week in the operation of the machine. This was in December, but there was no improvement. Thus things ran along until in February, when the vendor sent Mr. Kent and Mr. Dennison back, and the vendee refused to let them see the machinery, and on February 15th wrote the vendor this letter:

"We have used every possible effort towards giving your four drying machines a fair and thorough trial. You have sent representatives here

a number of times in the effort to put these machines in the condition called for by our contract of purchase with you. However, the machines remain unsatisfactory and you are in no respect up to the contract requirements and we are therefore forced to ask that you take these machines off our hands and return to us the installments of purchase price upon them we have already paid you."

It, however, continued to use the machines until April 15th, when it took them out of the factory and stacked them in a room. But before this on March 14th it wrote the vendor calling attention to its letter of February 15h, and added these words: "Please make arrangements to take possession of the machines not later than April 15th next."

The evidence for the vendor tended to show that the trouble with the machines after the new dryers were put in was due to the fact that they were operated improperly, and that the real trouble came from the fact that Campion wanted to use the Paramount forms. He did in fact continue to use the machines until he got the Paramount forms to take their place, and he was unable to get the Paramount forms until about April 15th.

H. R. Griffith was sent to Paducah by the vendor to remedy the trouble the machines were giving. He came there and examined them and tried to make them work. After several days he left, saying that he couldn't make these machines do the work; that they were designed for silk hose and were not designed for cotton hose, and could not be made to do good work on cotton hose. The circuit court improperly sustained the plaintiff's exceptions to this testimony, for Griffith was there as the agent of the vendor, sent there by it in response to complaint to correct the troubles, and what he said there after examining the machines is competent against the vendors. If in fact he was not a skilled mechanic and not qualified to speak on the subject or to know, the plaintiff may show this; but such proof only goes to the weight of the evidence and not to its admissibility, for at the time he made the statement he was its representative and acting for it.

If machinery is sold under a warranty and does not come up to the warranty, the vendee may, if he acts promptly, rescind the contract; but to exercise this right he must act in a reasonable time after learning of the

defects in the machinery. Meek Coal Co. v. Whitcomb Co., 164 Ky. 833; Glover Machine Works v. Cook Jellico Coal Co., 173 Ky. 675; Church v. Wright Machine Co., 190 Ky. 561; Vaughn v. Shady Grove Milling Co., 194 Ky. 326. Here, although the vendee continued to make complaints, the fact is that after H. R. Griffith left in December and after no further steps were taken by the vendor within a reasonable time for the purpose, the vendee continued to use the machines, and when later in February the vendor's experts arrived to examine them it refused to allow them to do so and retained exclusive possession of the machines and continued to use them until April 15th, when it had supplied itself with Paramount forms to substitute for them. By thus continuing to use the machinery so long it lost the right to rescind the contract. But if there was a breach of the warranty the purchaser to recover on the warranty is not obliged to offer to return the thing; he may retain it and sue for damages on the warranty. Decker Co. v. Baker, 146 Ky. 233; Nichols & Shepard Co. v. Dudderar, 184 Ky. 689; Hauss v. Surran, 168 Ky. 687. It clearly appears that the vendor sold the machines well knowing the specific purpose for which they were intended, and it is earnestly insisted that this being so there is an implied warranty that the machines were reasonably adapted to that purpose. This is ordinarily the rule. Cumberland Grocery Co. v. Harwood Barley Mfg. Co., 184 Ky. 70. But in this case there was an express warranty as to what the machine would do. It was guaranteed to at least double the production of an operator over the quantity turned out by the same operator when boarding by the method of using wooden boards. The quantity of work that the machine would do being expressly guaranteed in writing, there was no implied warranty that it would do more, and the vendor cannot maintain that it satisfied the contract if it did less. It was also expressly guaranteed that all the machinery, materials and supplies should be of good and suitable quality and that all work should be performed in a good and workmanlike manner. The parties having put their contract in writing the writing supersedes all the previous oral negotiations. The court should have excluded all evidence of oral representations to the effect that the machines would produce more than specified in the written contract. And neither of the parties can maintain that the machines were not reasonably

suited for the purpose intended if they produced as specified in the written contract, for by the written contract the parties fixed the standard by which it should be determined whether the machines were reasonably adapted to the purpose intended. The writing does not specify that the machines were to be used in manufacturing cotton hose. But this is the necessary effect of the writing when it was well known by both parties that this was the purpose for which the machinery was bought.

It is earnestly insisted that the proof showing that the machines produced less than half they were guaranteed to produce and thus cut down the production of the factory and disabled the vendee for filling its orders to this extent, the vendee's loss of profits should be recovered. In some exceptional cases this measure of damages has been allowed, but the proof here shows clearly that these machines were bought in an experimental state, and plainly the written contract was made with this in view. It was there provided that if the machines did not work in full accordance with the specifications, then, after the company tried to make them work by altering or adjusting them as might be necessary, the machines still failed to perform, the company must remove the machines if ordered to do so within ninety days from the date the dryer was started in operation. What the parties meant by a contract is often best shown by what they did under it. The dryers first put in did not work and new dryers were designed. The time for making the new dryers was extended without objection of either party beyond the ninety days. The new dryers were finally put in. The company was never ordered to take the machines out. The letter of November 13th simply advised the vendor that Mr. Griffith should proceed at once to Paducah and straighten things out or remove the machines from its premises, and notwithstanding this letter and the failure of the vendor to straighten things out, the vendee continued to use the machines. The loss of profits on these machines would necessarily occur while the company was making the necessary changes, and the correspondence between the parties clearly shows that the vendee at no time claimed that the vendor was responsible to it for lost profits while they were experimenting with the machines. To allow a recovery for loss of profits here would be to allow damages not within the

contemplation of either of the parties at the time of the transaction.   This cannot be done.

But it does not follow from this that the vendee is entitled to no relief.   It should not pay the full price for these machines if they did not come up to the warranty. It is alleged in the answer and counterclaim that the machines were of no value.   There is no prayer for judgment for the difference between the actual value of the machines and the value if as warranted, but there is a prayer for all proper relief. The proof shows clearly that the machines did not produce over one-half of the guaranteed quantity, unless running at a very high rate of speed, and that the machines were so constructed that they would not stand operation at this speed.   Even at this speed they did not come up to the guaranteed quantity. There was also evidence of a continual breaking of parts and that the cams and finger motion would not act properly.   A manufacturing machine is valuable for its production.   If it produces only half as much as it is warranted to produce this is some evidence that it is not as valuable as it would be if it filled the warranty.   The fact, too, that the parts kept breaking and did not function. though handled properly, is some evidence that it was not properly constructed.

The rule is that the measure of damages in such a case is the difference between the fair value of the machines as they were and as they would have been if they had come up to the warranty.   The court erred in peremptorily instructing the jury to find for the plaintiff and should have submitted the case to the jury, instructing them to allow the defendant on its counterclaim the difference, if any, in the value of the machines as they were with the parts added to them after their delivery and their value if they had been as warranted.

The written contract in this case is very different from that before the court in J. I. Case Threshing Machine Company v. Rose, 191 Ky. 433.   In this case notice was promptly given that the machines were unsatisfactory.   The company attempted from time to time to remedy the defects and at no time conceded that the machines could not be made to fill the warranty or offered to remove them.   In that case, and the cases there cited, the contract required the purchaser to return the machine,

and provided further, "The contract shall be rescinded to that extent and no further claim made on the company." The contract in this case is very different.

Judgment reversed and cause remanded for a new trial.